## Clifford v. Metropolitan Life Insurance Company.

(Decided February 20, 1923.)

### Appeal from Kenton Circuit Court.

1. Damages—Personal Injuries—Proximate Cause.—When the agents of an insurance company enter a residence and by ruse and artifice secure possession of a life insurance policy from a lady and carry it away over her protest, but use no force or violence and do nothing to alarm or frighten her, such conduct is indefensible but it is not the proximate cause of injuries thereafter received by her in pursuing them and falling upon the street nearly a block distant from her home.

2. Damages—Personal Injuries—Evidence.—Evidence examined and held that in this case the court did not err in refusing compensation for personal injuries received by a lady in falling upon the street while pursuing the defendant's agents who had deceived her into surrendering an insurance policy and which she desired to recover.

JOHN E. SHEPERD and B. J. KING for appellant.

S. D. ROUSE for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

This is a suit to recover damages of the Metropolitan Life Insurance Company for personal injuries, it being alleged in the petition that the defendant's agents and servants forcibly entered the yard of plaintiff's residence and by stealth entered her home, and by force and violence wrongfully and illegally took from her person and possession a certain life insurance policy. That by rea-

son of such wrongful conduct and force and violence and in her efforts to recover and protect her property she was made sick, and her nervous system damaged and impaired.

Appellant's husband, John Clifford, carried two small industrial policies in the Metropolitan Life Insurance Company, upon which there was an exchange value of $83.76. In June, 1920, he exchanged these policies for a straight life policy of $1,000.00, upon which the annual premium was $43.96. The exchange value of the industrial policies thus paid one year's premium on the new policy and lacked $4.16 of paying the second year's premium. The company's agent, Spencer, executed a receipt on the margin of the policy for the first year's premium and delivered it thus endorsed to Clifford, and he surrendered the industrial policies, but it seems did not sign the release required by the company. It contended that in exchanges of this character the entire exchange values of the industrial policies had to be paid as a premium on the new policy; that a payment is not accepted for less than a year, and that under the provisions of this contract Clifford should have paid it $4.16 in cash and have received the credit for two full years' premiums before the delivery of the policy, and it sought to have Clifford to pay the $4.16 or return the policies, which he declined to do. There was some controversy in reference to the matter and on the 20th of June, Spencer and another agent of the company named Mock, went to the residence of Clifford in the city of Covington to adjust the matter or secure the policy.

The residence was flush with the street and a tall closed fence separated his lot from the adjoining one. This fence came out to the edge of the street, leaving an alleyway a few feet in width between it and the residence, a door entering it from the street. Clifford's son had put a second door further back in the alley and had floored and covered this space and used it as a garage for a motorcycle. From the rear door of this garage the alleyway extended back to the corner of the house and there terminated in the back yard. It further appears that Robert Clifford worked at a garage at night and slept during the day.

On the morning in question Stevens and Mock knocked at the front door of the residence and receiving no response went around through this alleyway to the rear of the house and there found Mrs. Clifford washing.

As to what occurred thereafter plaintiff's evidence is to the effect that she was startled at seeing them; one of them asked to see the policy, and she asked him what policy and he told her. She replied that her husband was asleep and that she did not want to fool with it. He then told her that he was the superintendent from Louisville and that he must see the policy before he left; thereupon she went into the house, the man following her into the kitchen. In a short time she returned with the policy, not intending to give it up and showed the number on it to Mr. Mock. She held it up for him to see and he took it out of her hand and put it in his pocket and started out the kitchen door. She begged him to return it and he answered, "We have got it now and are going to keep it." Thereupon the agents hastily retraced their steps through the alley and down the street.

Mrs. Clifford ran in the house calling her husband, and out of the front door calling and screaming to the men to stop and give her the policy and shouting generally that they had taken it. This created a commotion and the agents hurried forward, with Mrs. Clifford still pursuing them as rapidly as she could, which she did for nearly a block, when becoming exhausted she fell to the pavement and thereby received serious injuries.

In the meantime a crowd had gathered and pursued the agents, who were overtaken and arrested by a deputy sheriff.

The garage in the alleyway was kept locked by Mrs. Clifford's son, who left it intact that morning about seven o'clock; he was telephoned of his mother's injury and returned at ten o'clock and at that time found the gate "smashed" against the side of the fence and the nails drawn out of the timbers.

The agents claim that the gate to the garage was open; that they opened the second gate quietly, and that they spoke to Mrs. Clifford respectfully and asked her about her husband and that she told them he was out at work, and that they asked to see the policy and that after some insistence she went and procured it and brought it back to the kitchen where they were standing; that Mr. Mock examined it and after conversing a few moments he told her he would have to carry it back and let her husband adjust it at the office. She objected and became peeved and they left bidding her a respectful adieu.

At the close of the evidence the court delivered an opinion to the jury from which it appears that he did

not consider that the defendant was liable for the personal injuries suffered by Mrs. Clifford, but that he was of the opinion that the manner in which the policy was procured constituted a technical trespass and instructed the jury to find nominal damages therefor. Under this instruction the jury returned a verdict of one cent for plaintiff and she has appealed.

The conduct of the agents was indefensible. Naturally Mrs. Clifford was irritated, but we fail to see how this conduct was the proximate cause of the injuries she received. No force was used, no threats made or menaces of any kind offered, hence she was not frightened or alarmed and thereby caused to run and fall, nor did these men do anything to induce her to follow them; on the contrary, after securing the policy, they were trying to avoid her. While the ruse that they employed provoked her to run after them, in so doing she acted voluntarily without any compulsion or persuasion on their part and this action of hers intervened between the occurrences at the residence and fall in which she received her injury.

Hence she was not entitled to recover for the personal injuries received in the fall. No cross appeal has been prayed and the propriety of the court in awarding nominal damages is not before us for consideration.

Judgment affirmed.